etc. et al. v. Deval Patrick etc. et al. Ms. Bartos. May it please the court, I'm Sarah Bartos. I'm here today representing the class of Plaintiff Appellant Children. Your Honors, I respectfully request that one minute be reserved for rebuttal. Would you like two? Two would be fine, Your Honor. I think you may need it. Your Honors, plaintiffs, a class of children through individual name plaintiffs, brought this suit seeking injunctive relief to abate long-standing deficiencies within the Massachusetts child welfare system, and particularly the foster care system, the out-of-home care system. And these defects, these systemic deficiencies expose children to actual harm and an ongoing risk of harm until they're abated. Based upon substantial evidence, Your Honors, presented at trial, the district court found that the Department of Children and Families in Massachusetts indeed fails to conform with federal and state law, regulation, and even with the agency's own policies, which set forth the professional standards for operating and administering a sound child welfare system. The district court made those findings in particular instances, but its overall finding was that there was no substantial departure from accepted professional standards. That is the finding that the court made. You made the strategic decision of bringing this as a class-wide suit, which greatly increases your burden. I mean, you've got to do more than show isolated instances, horrendous though they may be. That is true, Your Honor. And what plaintiffs presented at trial was evidence that showed just that in this way. Plaintiffs first brought forth named plaintiff stories showing what happens to individual children who are exposed to the deficiencies in the system, including the inadequate array of foster homes where we showed that named plaintiffs were shuttled from home to home and traumatized through that lack of stability. The absence of adequate visitation and safety practices where kids were literally raped in foster care. We showed that, but beyond that, and used an expert, Lynette Lessing, to present social work judgments with respect to departures from applicable professional judgment in the care of those individual named plaintiffs. We went one step further, Your Honor, and called experts that spoke to the fundamental pillars. What one expert called building blocks, what another expert, Ms. Jones, called hinge pins of sound administration of a foster care system. Things including appropriate caseload so workers have time to do what they're supposed to do per policy. A sufficient array of foster homes so that children can be matched to placements that can truly safeguard them and care for them. A quality assurance so the system can identify harms to children and impose corrective actions on a timely basis. Those are structural defects, Your Honor, that are common to any child that walks through the front door, if you will, of the foster care system in Massachusetts. Each child is exposed to common risks that flow from a system that doesn't have adequate pillars. You seem to be ignoring the fact that the district court, after hearing that evidence, made its finding that there was, on a class-wide basis, no substantial departure from accepted professional standards. Now, that finding is reviewed for clear error, is it not? Your Honor, I would respectfully disagree. That error is legal error, error in applying law to fact findings of departures from judgment in the system. And the error that we're asserting here, Your Honor, is reminiscent of an error that occurred or incomplete record that occurred in the Santana-Colazo case that this court entered. Here, there were specific findings of systemic deficiencies made by the court in a variety of ways. When the court applied the law to those findings, and we do dispute the culpability standard that was applied here, but when the court applied the law to those findings, the court did not address each of the alleged departures from professional judgment one at a time and demonstrate that, indeed, there was some professional judgment by the administrators of this agency to back up why those practices were occurring and not on a one-off basis. It wasn't a one-time basis, it wasn't carelessness, it wasn't a momentary lapse. Year in, year out, sustained, chronic, long-standing departures from professional judgment. The court did not show there was any basis for that. I thought that the record before Judge Young showed that the performance in Massachusetts DCF, although far from perfect, rather than being chronic and sustained, that the performance levels have been improving incrementally year by year. What the court found in that regard, Your Honor, was, with respect to the issue of caseloads, and caseloads alone, Your Honor, that improvement had been taking place in the overburdened number of cases, or the burdensome number of cases that individual caseworkers were carrying. However, that finding was in relation to a standard that the evidence showed by DCFs, the defendant's own admission, was antiquated, rapidly becoming obsolete was the words of the agency. So this was improvement against a standard, which isn't the standard, the professional judgment standard, but was an admittedly excessive caseload amount that the state used as a target. We had experts testify that the appropriate standard wasn't 18 families per caseworker, but rather per professional organizations was 15 children per caseworker, a significant difference. So the improvement wasn't toward meeting established professional judgment as to caseloads. Instead, it was moving toward a standard that itself was antiquated and inappropriate. Otherwise, Your Honor, the court did not make findings with respect to the other serious errors in this agency or deficiencies in this agency that improvement was taking place. For example, on the important safety requirement of visiting children in their foster homes, laying eyes on the home to make sure it's safe, what could be more fundamental? It seems to me that you did an excellent job of convincing the court with some pretty compelling evidence that Massachusetts does a poorer job of taking care of these children than most other states do. That then posed for the court the constitutional question of whether the deviation was so substantial as to violate the Constitution. And that then creates the problem that I think we're asking about on page 67, where the court says that applying the substantial departure test and having identified the departures, it doesn't find a wide enough or a substantial enough departure. It's not off the curve. It's at the embarrassingly low end of the curve. Why isn't that a factual finding that we're required to defer to the district court on? Your Honor, we assert that that factual finding or the finding of law to fact, as Your Honor has pointed out, is itself infected by legal error. In applying a professional judgment standard below, the district court does not find a substantial departure. So what precisely is the legal error, other than that you disagree with the court's conclusion that it was not a substantial departure? In finding that the departures proven were not substantial, what the court reasoned was as follows. These administrators operating the system indeed are operating it in a way, as I found in my findings, a fact that deviates, and in some instances quite far. In this instance, I see, and this the court applied across all claims, including the substantive due process claim, I see that the common thread here isn't management myopia, but a lack of funding. And I find essentially what the court found here is that these defendants were exercising sufficient good faith in operating the system such that it was not a substantial departure. If you look at the standards of care on pillars of administering a foster care system, the legislature is where you belong, not here. And we've submitted in our brief that one, that was error in applying or suturing a mens rea or wantonness element onto the Youngberg standard, which case law does not support. And secondly, it was elevating physical considerations to a defense in a constitutional case where fundamental rights have been shown to be violated. That infection of legal error calls for review here more toward the de novo end of the continuum. Your Honor, I'd also like to address the issue of class-wide harm. This court found that there was insufficient showing of class-wide harm. In so finding, the court committed additional legal error. It looked only to the evidence on named plaintiffs in making that finding and ignored its own substantial factual findings as with respect to aggregate data showing that Massachusetts children in large numbers, scores of children, were being moved from home to home too quickly. The court also found that children were experiencing abuse or neglect substantiated by the state itself in state foster care. Again, placing... Help me with this. How do we do this? We've got 50 states. There's always going to be a bottom 10. Do we adopt as a rule that if you're in the bottom 10, it's a constitutional violation as a matter of law? And if that isn't the rule, then what more would we need to have? In response to the court's question, Your Honor, beyond that evidence that Your Honor is asking about, I'll get to it right now. The court also didn't factor into its class-wide harm evaluation the risk of harm, a key element of a case-seeking perspective injunctive relief, an element that's been determined to be appropriate in terms of harm in this kind of case. We cited the DG case, a foster care class-wide action. But answering Your Honor's point, what the court didn't look to was look beyond the aggregate data and what is missing here? Is there a risk? And we provided evidence from qualified, competent experts that a system cannot expect safety for children if it doesn't have adequate visitation practice, if it doesn't have timely investigation practice, if it doesn't have a suitable quality assurance system. The court found that in each of those areas, there were deficiencies that open up a risk to children of unsafe conditions and then actual harm to kids, kids at some point dying in care or being raped in care as Connor was. And that risk was real. And until those structural deficiencies are abated, that risk is real. That was not factored into the class-wide harm analysis. The court missed the whole risk of harm piece and missed the notion of common structural deficiencies that create a system in which children cannot be maintained safe. Your Honor, plaintiffs sought below application of the Youngberg professional judgment standard. That was not the standard applied here. And we assert that that was in error. The Supreme Court, through the cases of Stowell. But what the district court did, as I understand it, grafted a chock-the-conscience test on top of the Youngberg standard. Is that correct? That's true, Judge. But since the district court found against you on both prongs of its two-part standard, if the district court did not err on the no class-wide substantial departure finding, then we never have to reach the question of whether it had to go on to the chock-the-conscience test or whether that was inappropriate. Isn't that correct? That's true, Your Honor. Plaintiffs must show class-wide harm in order to obtain a reversal. That is true. And as I've argued, we believe the court erred in finding no class-wide harm and committed legal error in its assessment of that claim by not taking into account risk of harm, which was proven through the deficiencies in the record. Your Honor, we do believe, by the way, that on the funding issue we've raised in our brief. Why don't you finish the thought and you still have your two minutes. Thank you, Your Honor. The funding claim absolutely permeates this court's decision from beginning to end. It's a reason raised to send plaintiffs away as to each cause of action and it's a key feature of the conclusion. That error in using a funding defense in this case is reason alone to reverse the case and send it back for further proceedings. Thank you. Ms. Tran. Good morning, Your Honors. As this court has indicated, this court need not reach the issue of whether it was legal error for Judge Young to apply that second prong to plaintiff's substantive due process claims because he first found that plaintiffs failed to meet their burden on the first prong, which both sides agree is the threshold inquiry to determine culpability on a substantive due process violation. And that finding was amply supported by the evidence beforehand. He not only heard evidence from four experts for the plaintiffs and certain fact witnesses, but he also took testimony from Angelo McLean, the Commissioner of DCF, who testified for almost seven days and was subject to full cross-examination. He also had the benefit of reading the deposition transcripts that the plaintiffs themselves put into evidence as part of their case of almost every senior staff member at DCF, including most of the deputy commissioners. And it's through those witnesses that Judge Young heard evidence such as the fact that during Commissioner McLean's tenure, DCF was able to reduce the overall number of children that came into its care, increase the number of children that were placed with kin or in child-specific homes, reduce the social worker caseloads from 18 to 1 to 15.28 to 1, and increase the percentage of children that were kept safe from abuse and neglect after being taken into DCF's care. Let me ask you about that. What is Massachusetts' position on the percentage of children who can be raped or murdered or otherwise seriously harmed before we would find a constitutional violation? It's not a matter of the percentage of children for whom those things could happen to. There is some number of children who are always at risk of those things in DCF, and if for no other reason than the fact that they come from families where they have already been abused and neglected before we get to them. But we're just talking about the children that you have taken into your care, you've assumed the responsibility for those children, and then something bad happens to them. How much leeway does the Constitution give you? How many kids? There's not an exact number that we could put forth. The issue is whether or not the agency is exercising professional judgment in its efforts to keep those children safe. And in the case at hand, the agency is consistently ranging in the 99th percentile. And as Your Honor indicated, yes, it is below in the bottom 10 with respect to these numbers. But the reasons for that, as Judge Young indicated in his findings and rulings, are numerous. That you can't, the comparators amongst states are misleading, because each state has a different standard by which it substantiates abuse and neglect claims. So some states are going to screen in more claims at the outset, which is going to increase or decrease the numbers of children that appear to have been abused in its care. Whereas other states are going to have a higher burden or screen in things that, not screen in things that another state might. Those comparators are inappropriate and the federal court, rather the federal government makes clear that those comparators are misleading. And that was part of the evidence presented to Judge Young at trial through plaintiff's own experts. Not only did Judge Young hear that DCF was able to keep 99 percent, more than 99 percent of the children that it took into care safe from abuse and neglect while they were in its care. He also heard that DCF was able to achieve satisfaction on its program improvement plan with the Administration for Children and Families, which is the oversight body tasked with monitoring child welfare agencies to make sure they are meeting or coming close to meeting the aspirational goals it sets for the kids in its care. That means that for each time that ACF evaluated the system and identified vulnerabilities in the system, inevitable vulnerabilities in the system, or imperfections in the system, it then engaged with Massachusetts in creating a plan that Massachusetts could demonstrate significant improvement in those areas to satisfy the federal government that it is exercising judgment. In every instance, Massachusetts received confirmation from ACF that it had satisfied the requirements and was making satisfactory progress towards those aspirational goals. The very goals that plaintiffs now contend its failure to meet is a constitutional violation. It was only after hearing this type of evidence that Judge Young specifically found that plaintiffs had failed to meet their burden as articulated in Youngberg. And it's not true that he applied a heightened standard of some sort to the facts here, that there was some legal error in his application of the standard. Plaintiffs make reference to the word wanton, which I assume is reference to the court's phrasing of the term wanton abandonment with respect to the threshold that they need to meet. But what that really is is a nod to the stringency of the actual standard that Youngberg puts forth. It's more than just a departure from professional judgment. Youngberg requires such a substantial departure from accepted professional judgment as to demonstrate that the person responsible actually did not base the decision on such judgment at all. That's more than just a departure. Now, despite his finding that there was no constitutional violation, did Judge Young find that DCF was perfect? And is DCF perfect? No, absolutely not. He identified, as they call it, a laundry list of vulnerabilities or problems that plague DCF, that plague many child welfare agencies across the nation. But perfection isn't the standard, and an imperfect system is not the same as a constitutionally violated one. At a fundamentally human level, it's absolutely true that harm to even one child is too much. As Your Honor is alluding to, when we're talking about percentages in the 99th percentile, those fractions of a percentage represent children. Absolutely. And DCF is well aware of that. The defendants in this case have dedicated their lives to protecting those children. And it's a struggle to separate the emotional, very human lens that we view those circumstances in from the legal standard that we must apply to this situation. But it's imperative that we do not conflate the two. The reality is that the function of DCF is not a generic bureaucratic function. It isn't issuing fishing licenses. It is charged with taking care of children who have been abused and neglected by the very people who are supposed to be caring for them at the outset, by their biological family. Not only does it take these children into its custody and have to provide for their basic human needs, but it makes efforts to see that they flourish. And it has to do this while managing those biological relationships with their families. This is complicated. It's not an exact science. There's a human element here that is difficult to control. No one is more aware of that than DCF. But the point is that the defendants exercise professional judgment in setting the policies and practices and procedures of the agency, all aimed at improving in the areas that the defendants, rather that the plaintiffs challenge in which they are deficient. And those challenges, really what they're doing, Judge Young did not identify systemic deficiencies. What he discussed as part of his findings and rulings are the ways in which they fall short of the aspirational goals that are set by the federal government by various child welfare organizations. And this is the proof that plaintiffs put on at trial. They put on the stories of three of the named plaintiff children in summary fashion, stories that were admittedly tragic. And then put on evidence that DCF falls short in static isolated moments in time of meeting the aspirational goals set by the federal government. Goals that the federal government itself admits, and this was in evidence at trial, it sets deliberately high in an effort to motivate systems to continue improvements. Their argument is that in falling short of these goals, DCF is constitutionally broken. But that can't be the standard. It can't be that if the federal government sets an aspirational goal that we fail to meet, but nonetheless make improvement towards, we are constitutionally broken. It can't be that if DCF sets its own internal goal and sets it high in an effort to meet its own internal standards, to require caseloads every 30 days, which it does. The judgment it exercises to require caseloads, require case visits rather every 30 days, child visits. And it has policies in place that require that. It supervises its social workers in efforts to make sure that happens. It disciplines social workers sometimes when they are unable to make that happen. It tries to reduce the caseloads in an effort to make that happen. But the reality is it will not always reach full compliance with even its own internal standards. Counsel, can I interrupt and ask you to focus on something a little different? The plaintiffs here are repeatedly attacking Judge Young for the several statements which he made throughout his opinion concerning the role of underfunding by the Commonwealth in the performance by DCF of its duties. I'd like to know what your take is on the significance of those comments by Judge Young, if any. Absolutely, Your Honor. The plaintiffs seem to be arguing that Judge Young used the economic deficiencies as a shield to protect DCF from constitutional liability. But that's not actually supported by the record. Before, he first of all at the outset of his opinion indicates that it would be impermissible for him to do so, that he is not permitted to shield the agency from constitutional culpability as a result of deficient funding. And then he goes through and does a careful analysis, over 60 pages of factual findings and analysis with respect to the various successes and failures of the system. Then he applies those facts to the legal standard as to whether or not there's evidence of professional judgment. And he first finds that there isn't evidence that they have departed from professional judgment. Arguably, he also finds that there's evidence they've exercised sound judgment in the improvements they've been able to make. But he first finds no evidence of a departure. No evidence of a departure? Of a substantial departure. Of a substantial departure. You're absolutely right, Your Honor. In a case of institutional reform litigation, there's a lot of things judges can do if there is a culpability finding. But in the instances where the proof falls short, where there is no culpability finding, they are limited. In that case, what they can still do is to identify the ways in which the system is still suffering or the ways in which the system could be better and send a message to the legislature that more money into the system could help. It could always help. This is in keeping with typical institutional reform litigation, this type of dicta that you find in the opinion. And it's in keeping with the fact that while he is a jurist, he is also human and sees and understands, as we've discussed, that these percentage points that we're talking about, that the ways in which they fall short on these measures, we're really talking about children. So as I understand it, you view those statements as hortatory rather than as a basis for the decision. Absolutely. And in fact, his ruling with respect to the foster care maintenance rate suggests that he would not shy away from issuing a ruling that would directly require the legislature to funnel money into the system. What he says with respect to the foster care maintenance rates is, you've met the USDA standard and so this is a moot issue, says the plaintiff. The defendants have met the USDA standard for the foster care maintenance rates. They've been able to bring it up each year through the back end and now they are clearly at that level. So you don't have a claim here. But if they fall short of that rate, if in the future they fall short of that rate, come back. And then there might be a culpability finding. And if he's willing to make a culpability finding on something as to whether or not the foster care maintenance rate is set appropriately, that is a line item in a budget that the legislature has direct control over. Clearly he's not afraid to issue a finding that's going to impact or require the legislature to put money into the system, but he recognizes he can only do that when it's first a culpability finding at a constitutional level, which was not true here. Going back to the issue of whether or not the aspirational goals and DCF's failure to meet those goals can be evidence per se of a constitutional violation. We submit that it cannot. First of all, with respect to these aspirational goals, no state meets them. None. So if it was the case that failure to meet these goals, that looking only at where DCF measures with respect to those goals at a particular isolated point in time demonstrated constitutional violation, that every state would be in per se a constitutional violation on respect to those measures. And second, it ignores what is the real job of the jurist in this case, which is to look below the numbers. Sure, he doesn't ignore them. That's a starting point. But to look below the numbers to decide and to develop the record as to what are the judgments that the agency is employing in an effort to address where it falls with respect to those numbers. Are those judgments resulting in improvement over time? Is it coming closer to reaching the goals set by the federal government or by the child welfare agencies? How is it handling the vulnerabilities in its system? Is it overseeing it? And in this case, he found, yes, that it is. Again, that there are problems and that we are talking about children and when we're talking about children, we worry about problems. But he heard Commissioner McClain testify to seven days, over seven days, about the ways they worry about children, about the various initiatives that they have put in place in an effort to address shortfalls in the system, about things like the kinship initiative or the development of an entirely new case practice model, which completely overhauled the system, about redistributing the work amongst the system so that it's balanced and so that more children can be visited. He heard all of these things. And he found that while they don't always achieve strict compliance with respect to the aspirational goals or their own policies that they set, they are making strides towards doing so. And in a system of this size that services over 40,000 children on any given year and employs thousands of social workers, those kinds of improvements don't happen by accident. They happen not only as a result of the exercise of professional judgment but of sound judgment. Thank you, Your Honors. Thank you. Thank you, Judges. Your Honors, first of all, with respect to the issue of the standards applied by plaintiff's expert and presented to the trial court, those were not aspirational standards. The departures from professional judgment proven here were based on federal and state law, federal and state regulation, and the policies of the Department of Children and Families itself. Those are not aspirational. Those are the fundamental requirements for operating a sound child welfare system. The aspirational, as my opponent is calling them, standards that were in play are performance outcome measures that were established by the federal government to determine how systems operations are impacting children and where they can be improved. Those standards were based on a data collected, a data pool collected across the entire country, and the standards were set at the 75th percentile of performance. That's what we're talking about with those. And what we used, the CFSR performance measures to show, was not the substantial departure from a known standard, but rather to show that because of the deficiencies in practice, there are scores of children who are being harmed, and at levels that fall at the bottom of the barrel nationally, that what one should expect when visitation isn't occurring,  the rate of harms that flow from that naturally indeed are happening here and at rates that place the commonwealth at the bottom of the barrel. Kids are moving rapidly from home to home. The data showed that. But that's not the aspirational standard that was shown here. Rather, we showed that the policy of the department and the requirements of federal on 4E is that you maintain a recruitment and retention capacity to have sufficient foster homes on board so that children can be matched to a home where they can be kept stable and safe. That isn't happening. Thank you, counsel. Thank you, Your Honor. This is well argued on both sides. The court is appreciative of the help you've given us.